ROMERO *v.* KING.

1. JURY—QUESTIONS OF FACT—CONSTITUTIONAL LAW.
   The right to have a trial by jury of issues of fact in an action. at law is guaranteed by the Constitutions of the State and the United States (US Const, Am 7; Mich Const 1908, art 2, § 13).

2. PLEADING—MOTION TO DISMISS.
   A motion to dismiss on the pleadings in a negligence case is to be tested the same as a motion for directed verdict at the conclusion of trial, that is, in the light most favorable to the party opposing the motion.

3. AUTOMOBILES—RELEASE—MOTION TO DISMISS—BURDEN OF PROOF —OVERREACHING.
   Defendant motorist in passenger's action arising from collision with an abutment on the highway, in which plaintiff received 27 bone fractures, wherein defendant interposed defense of release that had been obtained for $500 while plaintiff, a Mexican with a third-grade education, was in one hospital awaiting transfer to another hospital, *held,* not to have sustained burden of establishing such defense as a matter of law, in view of testimony taken at hearing on motion to dismiss casting doubt upon what plaintiff understandingly signed and agreed to,' what defendant's insurance adjuster advised him as to his rights, plaintiff's status as a penniless patient in a hospital, and his susceptibility to overreaching.

CARR, C. J., and DETHMERS and KELLY, JJ., dissenting.

Appeal from Ionia; Davis (Morris K.), J. Submitted June 7, 1962. (Docket No. 24, Calendar No. 49,329.) Decided October 1, 1962.

REFERENCES FOR POINTS IN HEADNOTES
[1] 31 Am Jur, Jury § 20 *et seq.*
[2] 41 Am Jur, Pleading § 332.
[3] 45 Am Jur, Release §§ 24, 45.

Case by Leonard Romero against Stanley E. King for personal injuries sustained while a passenger in defendant's automobile. Cause dismissed on motion. Plaintiff appeals. Reversed and remanded.

*Charles Benjamin* (*George La Plata,* of counsel), for plaintiff.

*Allaben & Massie* (*Keith A. Vander Weyden,* of counsel), for defendant.

Kelly, J. (*dissenting*). Plaintiff herein filed his declaration to recover damages caused as the result of an automobile accident which occurred some time between 2 and 3:30 a.m. on August 21, 1960, while he was a passenger in a car driven by defendant, Stanley E. King. Plaintiff claims to have been a passenger for hire in the King automobile on the date of the accident when said automobile collided with an abutment located on Hawley highway, Kenne township, Ionia county.

In the evening of August 20, 1960, plaintiff made known in a bar in the village of Belding that he desired transportation to a given destination (Stuart Roberts' place) some 6 or 7 miles into the country, and defendant King, who overheard the conversation, offered to drive plaintiff there.

Plaintiff claims to have given King $5 out of which King purchased $3 worth of gasoline and returned $2 to plaintiff. Plaintiff and defendant had not met each other previously.

The trip was accomplished but no one was at home at the Roberts' place. Defendant then called upon other friends. Plaintiff claims to have stayed in the car and, because of defendant's extended absence, dropped off to sleep. He claims in his statement (exhibit A) that he did not awaken until in the hospital where he was taken following the accident.

Plaintiff in his declaration alleges that defendant operated his car at great speeds and with wilful and wanton disregard of the rights and safety of his passenger; that he (defendant) did not keep the car under control but instead fell asleep and the automobile collided with an abutment, thus causing the accident.

Defendant denies plaintiff's allegations in these respects and states that plaintiff was a guest passenger in his car;* that he was driving in a prudent and careful manner and that the accident was caused because of a blowout of the right front tire, which caused the car to turn sharply to the right and into the abutment. In his affirmative defense, defendant claims that plaintiff was so intoxicated that he could not keep a proper and alert lookout for his own protection and safety, and relies upon the execution of a release by plaintiff to defendant in the amount of $500 "of and from any and all liability, claims, demands, controversies, damages, actions and causes of actions on account of personal injuries and any and all other loss and damage of every kind and nature caused by or resulted or hereafter resulting to the undersigned from an accident which occurred on or about the 21st day of August, 1960," and moved for dismissal of the action.

The matter came on for hearing upon the motion to dismiss and the answer thereto. Testimony was taken and, after hearing, the court entered its order granting defendant's motion and dismissing the cause. It is from this order that plaintiff appeals.

Plaintiff Romero gave 3 statements to a Mr. Stefaniak (adjuster for defendant's insurance company), each of which was reported stenographically. The first statement (defendant's exhibit A) was taken September 19, 1960, at 10:30 a.m.; the other

---

* See PA 1949, No 300, § 401 (CLS 1956, § 257.401, Stat Ann 1960 Rev § 9.2101).—REPORTER.

2 statements (defendant's exhibits B and C) were 2 separate interviews in the evening of September 19th. The first statement (exhibit A) makes no mention of a settlement but is plaintiff's version of the events of the evening of the accident; exhibit B details the injuries received by plaintiff, and exhibit C is the conversation pertaining to the settlement negotiations. The release was signed and check in settlement accepted on the evening of September 19, 1960.

Plaintiff testified on direct examination at the hearing on the motion to dismiss that he had little education and that he understood "that was all the cash money to me, but not included my hospitalization." Later upon cross-examination he gave the following testimony:

"*Q.* Now, you did sign this release, didn't you, with your left hand, this exhibit 'D' (release), I am showing you? You signed this, didn't you?
"*A.* Yes.
"*Q.* You did that with your left hand, didn't you?
"*A.* Yes.    *    *    *
"*Q.* Tell me this. You answer my question. When you signed that Mr. Stefaniak said 'You understand this $500 is a full and final release for everything,' didn't he?
"*A.* You mean include everything?
"*Q.* Yes. He told you that?
"*A.* He told me that.
"*Q.* And you said 'Yes' didn't you?
"*A.* Yes.    *    *    *
"*Q.* He told you, Mr. Stefaniak, he said 'This $500 is a full payment for everything that happened in regard to the accident' didn't he?
"*A.* Yes.
"*Q.* And you said 'I understand' didn't you?
"*A.* Yes.
"*Q.* And you did understand, didn't you?
"*A.* Yes."

The court in its opinion said:

"The proofs show that the plaintiff accepted a $500 check from the defendant's insured [insurer?] as a full and complete release of any and all liability of the defendant to the plaintiff. The testimony showed that the plaintiff fully understood the settlement, understood that he was receiving a check for $500 in full settlement of the claim here involved. The plaintiff's own testimony indicates, practically establishes, that he understood what the effect of the release was and there has been no testimony of any fraudulent representations by the adjuster in this case. As a matter of fact, the proofs show that, exactly what the transaction was, was made very clear to the plaintiff. There is a valid release of all liability and that is the defense of this cause. An order will enter dismissing this cause."

We agree with the trial court's finding that plaintiff fully understood the settlement and executed a final and complete release and that there was no proof of fraudulent representation by the adjuster. The judgment should be affirmed. Costs to appellee.

CARR, C. J., and DETHMERS, J., concurred with KELLY, J.

BLACK, J. With the arrival of this appeal there remains but little doubt that our fancy new rules of peremptory practice are being regularly employed —subtly and effectively—to circumvent the revered and hitherto guaranteed right to have presented issues of fact tried to and decided by juries. For attestation of such right, as it was in the beginning, is now, but—if current sly schemers do have their way—will never hence be, see United States Const Am 7; Mich Const (1850), art 6, § 27; Mich Const (1908), art 2, § 13 (duplicating the 1850 guaranty); *Underwood* v. *People,* 32 Mich 1 (20 Am Rep 633);

*Swart* v. *Kimball,* 43 Mich 443;[1] *Paul* v. *Detroit,* 32 Mich 108; *Risser* v. *Hoyt,* 53 Mich 185.

Here the defendant pleads affirmatively a release of the cause for ordinary and gross negligence plaintiff has pleaded. Having pleaded such defense, and having moved for final judgment on sole strength thereof, defendant has assumed the burden of persuading—by the presently quoted standard of favorable view—that what was done in the hospital to this ignorant migrant should receive sanction of law as a matter of law. There he was, grievously injured,[2] not represented by legal skill or armed with a hired record maker as was the defendant, and dependent solely on the not exactly disinterested representations of defendant's adjuster for understanding of his legal rights and the consequences of that which the adjuster proposed to him and ultimately obtained at plaintiff's bedside.

Courts are supposed in the name of constitutional right to scrutinize and determine these modern motions for decisive pretrial judgment by the same test we profess when a motion for directed verdict is presented at conclusion of trial of a negligence case, that is, "in the light most favorable to the party opposing the motion." The recent cases of *Poller* v. *Columbia Broadcasting System, Inc.,* 368 US 464 (82 S Ct 486, 7 L ed 2d 458); and *United States* v. *Diebold, Inc.,* 369 US 654 (82 S Ct 993, 8 L ed 2d 176), so attest. As said in *Diebold,* if there is a choice of conflicting inferences to be drawn from the sub-

---

[1] In this case Mr. Justice Cooley, writing for Michigan's "Big Four," said (p 448) that the right of trial by jury which, by the Constitution was to *remain,* was "the right as it existed before; the right to a trial by jury as it had become known to the previous jurisprudence of the State."

[2] Plaintiff's injuries were suffered August 21, 1960. He was hospitalized continuously thereafter until "Before Christmas." The adjuster visited him at least twice on September 19, 1960 at the hospital, and obtained the release that day. Aside from other details, plaintiff's injuries were confined to a mere 27 bone fractures.

mitted affidavits, exhibits, and depositions, the motion should be denied. In this instance there is such choice and abundant proof thereof consisting of salient doubt that plaintiff knew or was informed that he was releasing everything for the $500 paid him in the hospital.

My Brother, voting to affirm, has selected as support for his vote the most unfavorable-to-plaintiff testimony and inference one can find in the appendices, all brought out by leading questions of defendant's counsel during cross-examination. Here is some of the other kind, copied connectedly from defendant's appendix,[3] from which we should draw inferences favorable to plaintiff if we are to follow the stated rule:

"*Q.* Where were you born, Mr. Romero?
"*A.* Mexico.   *   *   *
"*Q.* How far did you go in school, education. How far did you go in school?
"*A.* Until the third.
"*Q.* Third grade. Where?
"*A.* Gallup, New Mexico.
"*Q.* What kind of school was that?
"*A.* Just a small village with the Navaho Indian reservation.
"*Q.* Mr. Romero, do you remember talking with this gentlemen sitting here that testified, Mr. Stefaniak?
"*A.* I talked to him.
"*Q.* You remember talking to him. Do you remember seeing the gentleman that was in that chair first, the gentleman sitting over there with the glasses on?
"*A.* Yes.   *   *   *
"*Q.* Now, Mr. Romero, did you at the time that you signed the papers with your left hand, did you know what your hospital bill was at that time?

---

3 To avoid misunderstanding of that which is copied from defendant's appendix, it is noted that all breaks by asterisk are those of defense counsel rather than our own.

"*A.* No.

"*Q.* Do you know what your hospital bill is now from the Ionia Hospital?

"*A.* No.    *    *    *

"*Q.* Do you know how much your hospital bill is in Detroit?

"*A.* No. They sent me a letter and they didn't tell me how much it is. They have to put what the doctors, I don't know.

"*Q.* How long were you in the hospital in Detroit?    *    *    *

"*A.* It was in December when I came out.

"*Q.* Was it before Christmas or after Christmas?

"*A.* Before Christmas.

"*Q.* Did you have any operations performed in the Providence Hospital in Detroit?

"*A.* Yes.

"*Q.* How many?

"*A.* They took me 3 times for 1 week upstairs and they put something, I don't know, wires in, some kind of, I don't know how to say that but slide wires around you—

"*Q.* Around your head?

"*A.* Around your neck and in here (indicating) and then they put some kind of heat. I felt funny. I felt kind of dizzy. I don't know what it is.    *    *    *

"*Q.* Where do you work?    *    *    *

"*A.* J and L stainless steel division.

"*Q.* Are you working now?

"*A.* No.    *    *    *

"*Q.* Have you done any work since your accident?

"*A.* No. I still under doctor's care. Doctor Francis in Detroit. I still under his orders, I mean.    *    *    *

"*Q.* Mr. Romero, you were offered a check, is that right?    *    *    *

"*A.* No. (Shook his head.) The first time he didn't tell me nothing and I didn't tell him nothing. Then the second time when he come in we was talking, when I was in the wheel chair there and then he left again that day and he came back I think in the afternoon that same day and then I asked him be-

cause they wanted to transfer me to Detroit and they wanted me to pay them $20 in cash for the ambulance service and I didn't got the money, so then I asked him if he will pay just the ambulance service so they can release me to go to the hospital in Detroit and then he tell me that— * * *

"*A.* When I told him if he would pay the ambulance service then he told me, then I have to release me. Then I say, tell him I was happy to release me, I wanted to go to Detroit and then he told me, 'No, I don't mean that.' Then I don't know what, I have nothing to do with the hospital. What I mean, he say 'We are going to give you such release and then you don't get no more' and then I didn't say no more and he didn't say no more and then I don't remember exactly if it was in the little room or was in my room but I wasn't in bed, outside of my room. I don't remember if it was there and then I asked him if he could help me with money to pay the rent and then he told me and said 'We will see what' and then he asked me how much and I didn't tell him nothing and I said 'Well, I don't know.' and then in our conversation with him, so we said good bye to each other and then he left and said 'I might come back late this afternoon,' and I think he come back again the same afternoon or was it the next morning, I am not—but it was the same or the next morning. I am not too sure when he came back and this other gentleman. * * *

"*Q.* What were you doing in Ionia county in August, 1960?

"*A.* That is, I mean, there was no work at that time and I was down in Traverse City and then I was picking cherries in Traverse City. * * *

"*Q.* Mr. Romero, at the time that you were given this check, did you understand that you had no more claim against anybody for your hospital bills or for your wages?

"*A.* I was thinking that I wouldn't get no money for myself. I was thinking that money that after he gave me the money, the check, I was thinking the money was all the money I was going to get from

them, but I didn't know about this other thing here. I was thinking that was all the money to me in cash.

\* \* \*

"*A.* What I am trying to say is this that the $500 that the check was, that they give it to me, I was concerned, I was sure that money was all the money I can get, just solid money, just money of them.

"*The Court:* He said 'I think that was all the money I was going to get.' Is that right?

"*A.* Yes. That was all the cash money to me, but not included my hospitalization.

"*Q.* Did you think about your wages?

"*A.* Yes, I was thinking about them. I was thinking—"

Could plaintiff read and understand what defendant says was understandingly signed and agreed to? If not, did defendant's employee fully and fairly advise him respecting his rights and of the consequences of signing what should have been read to him with requisite care? Was plaintiff given to understand that his "hospitalization" would be paid, over and above the accepted $500? Was unfair advantage taken of plaintiff's desire to be moved to a hospital in Detroit and his inability to pay the $20 ambulance charge? Here are but a few of the questions which arise from this typical approach to one who, being recently and seriously injured, steadily hospitalized, and penniless, is an easy mark for overreaching either in the making of an exclusively one-sided statement or the releasing of a claim resulting from personal injuries which, if those injuries had proved fatal, would be settleable only under judicial surveillance and by judicial approval.

To move one out of court before trial, on a showing as here, is not quite so easy in other courts. See the recent annotation, "Right to jury trial on issue of validity of release" (43 ALR2d 786). So far as *Style* v. *Greenslade,* 364 Mich 679, is concerned, it

is enough to say that we review now only the grant with prejudice of a motion to dismiss; not an order for separate jury trial or of reference to equity. Orders of such nature may yet come along in this case. If so, and if review thereof is had, the *Style Case* may or may not come to authoritative play.

Since *Style* is discussed in the briefs, it may be well to point out that that case is inevitably due for scrutinous re-examination in the light of recent reaffirmation (*Dairy Queen* v. *Wood,* 369 US 469 [82 S Ct 894, 8 L ed 2d 44]) of that which was upheld in *Beacon Theatres, Inc.,* v. *Westover,* 359 US 500 (79 S Ct 948, 3 L ed 2d 988). Considering this Court's sweeping adoption of the Federal Rules (for effect January 1st), and looking again at Michigan's own constitutionally guaranteed right of trial by jury, it is not too likely that *Style's* reference to equity—of *Style's* issue of fact—will be repeated in the face of a timely demand for jury trial.

*Summary:* Upon favorable-to-plaintiff view of the present record we find that defendant so far has not sustained the burden of establishing, as a matter of law, the pleaded affirmative defense of release. For the present, and as in *Poller, supra,* 474, "We believe it to be good judicial administration to withhold decision on these issues."

The circuit court's judgment is reversed and the case remanded for entry of order denying defendant's motion to dismiss. Plaintiff shall have costs.

KAVANAGH, SOURIS, OTIS M. SMITH, and ADAMS JJ., concurred with BLACK, J.