CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, a Pension Trust, and Howard McDougall, a Present Trustee, Plaintiffs,

v.

MELODY FARMS, INC., a Michigan Corporation, a/k/a Sterling Capital Services, Melody Farms, Melody Farms Dairy, Sta–Fresh Dairies, Richardson Farm Dairy, Melody Distributing, Melody Foods; Ira Wilson *& Sons* Dairy Company, a Michigan Corporation; Lakeside Food Products, Inc., a Michigan Corporation; Sweldon Ltd., a Michigan Corporation, a/k/a Americo Enterprises, Americo Group, American Commercial Enterprises, and American Commercial Group; Lansing Dairy, Inc., a Michigan Corporation; Metro–Detroit Investment

Company, a Michigan Corporation; Sexton Dairy Company, a Michigan Corporation; Megon, Ltd., a Michigan Corporation; George & George, Michael J. George, and Sharkey T. George, Individually, Jointly and Severally, Defendants.

No. 94–72846.

United States District Court,
E.D. Michigan,
Southern Division.

July 8, 1997.

Daniel G. Kielczewski, Gene J. Esshaki, Carl F. Jarboe, Abbott, Nicholson, Quilter, Esshaki & Youngblood, P.C., Detroit, MI, for Wilson Defendants.

Donald R. Day, Cummings, McClorey, Davis, Acho & Day, Phoenix, AZ, for Melody Defendants.

Russell N. Luplow, David A. Sawyer, David Machnaki, Law Offices of Russell N. Luplow, Birmingham, MI, for Plaintiffs.

## MEMORANDUM OPINION AND ORDER

GILMORE, District Judge.

### I.

The present case is an action for the collection of delinquent liability payments, interest, and penalties incurred by an employer as a result of its withdrawal from a multiemployer pension plan. It arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381–1461.

### A.

The Plaintiffs in this action are (1) Central States, Southeast and Southwest Areas Pension Fund and (2) Howard McDougall, a Central States trustee. The Plaintiffs are referred to jointly herein as "Central States" or "the Fund."

The Defendants in this action include several corporations, a partnership, and two individuals, all of whom the Plaintiffs allege are liable for the withdrawal of one corporation from the Fund in 1984. The Defendants may be broken down into four groups. Those groups are as follows:

#### (1) *The Individual Defendants*

Two individuals are named as Defendants in this action. Those individuals are Michael George and Sharkey George.

#### (2) *The George Partnership*

One partnership, George & George ("George Partnership"), is named as a Defen-

dant in this action. Michael George and Sharkey George are the only partners in the George Partnership.

### (3) *The Wilson Defendants*

The Wilson Defendants are three corporations under common control and ownership: (i) Lakeside Food Products, Inc. (*"Lakeside "*), a wholly-owned subsidiary of (ii) Ira Wilson & Sons Dairy Company (*"Wilson "*), a wholly-owned subsidiary of (iii) Sweldon Ltd. (*"Sweldon "*). Michael George and Sharkey George are the 100 percent owners of the Wilson Defendants. Those corporations have been inactive for several years.

The withdrawal of Wilson from Central States in August 1984 resulted in the withdrawal liability which is the focus of the present action.

### (4) *The Melody Defendants*

The Melody Defendants are a second group of corporations under common control and ownership. The membership of this group is large and somewhat complicated.[1] However, it is not necessary for purposes of the present Memorandum, Opinion, and Order to understand the history of the membership of this group, as the membership is not disputed by the parties.

### B.

In August 1984, Wilson, constructively withdrew from Central States as a contributing employer as a result of its failure to continue making the required contributions to the Fund. Central States eventually assessed the liability for this withdrawal in the amount of $1,467,975. On May 28, 1985, Central States sent Wilson notice of this liability and demanded payment by August 1, 1985. The notice sent to Wilson on May 28, 1985, contained the following language:

> This is a demand for payment of withdrawal liability incurred as a result of a permanent cessation of contributions to Central States … by [Wilson] on behalf of some, or all, of its bargaining unit employees. This demand is made pursuant to § 4219 of [ERISA] and applies equally to all members of any controlled group of trades or businesses … of which [Wilson] is a member.

Wilson requested a review of the assessment on August 23, 1985. Central States responded to that request on November 11, 1985. In that response, it reduced the assessed liability to $1,379,912.71, and again made a demand for payment.

Rather than paying the revised amount, Wilson initiated arbitration of the assessment before the American Arbitration Association on January 21, 1996. In initiating this arbitration, Wilson was joined by Sweldon. In addition, at some point after arbitration was initiated, Lakeside also joined the proceeding. As such, Wilson, Sweldon, and Lakeside represented that they were members of a "common control group." No one of the Melody Defendants or the George Partnership became involved in the arbitration.

On July 26, 1988, Central States executed a Settlement Agreement with the Wilson Defendants. In order to reach this Settlement, the assets of these Defendants were liquidated. The liquidation process produced $31,878.40, which was paid to Central States. As such, over $1.3 million of the assessed withdrawal liability was unpaid.

Paragraph Two of the Settlement Agreement is central to the present Memorandum,

---

1. In *1984*, the year of the withdrawal at issue in this case, the holding company of the Melody Group was Melody Distributing ("Melody Distributing") Melody Distributing owned: (i) Melody Farms Dairy; (ii) Metro–Detroit Investment Company; (iii) Lansing Dairy, Inc.; (iv) Megon, Ltd.; (v) Sexton Dairy Co.; and (vi) Sterling Capital Services.

 In *1987*, holding company Melody Distributing merged with subsidiary Melody Farms Dairy. The merged corporations retained the name of the original holding company, Melody Distributing.

In *1988*, holding company Melody Distributing merged with subsidiary Sterling Capital Services. Again, the merged corporations retained the name of the original holding company, Melody Distributing.

In *1989*, holding company Melody Distributing changed its name to Melody Foods, Inc. ("Melody Foods").

In *1993*, holding company Melody Foods changed its name to Melody Farms, Inc. ("Melody Farms").

Opinion, and Order. It reads in pertinent part as follows:

> Without acknowledging or admitting liability with respect to, or the validity of, the Withdrawal Liability Claim, Wilson, Sweldon, and Lakeside hereby agree to use their best efforts to sell and dispose of their assets in arms-length transactions with unrelated third parties and to pay the net proceeds thereof ... to the Fund in full and complete settlement, satisfaction, and discharge of the Withdrawal Liability Claim. In connection therewith, the Fund hereby fully and forever releases, waives, and discharges, and relinquishes any and all claims, liabilities, causes of action and/or obligations for the payment of withdrawal liability which it has asserted or could assert now or in the future based upon (i) any presently existing facts or any events or occurrences arising prior to the execution hereof or (ii) the cessation of contributions or an obligation to contribute on behalf of one employee on whose behalf Wilson is a contributing employer to the Fund, against Wilson, Sweldon, or Lakeside, their officers, directors, shareholders, agents, or employees (except for the obligations of Wilson, Sweldon, and Lakeside under the terms of this Agreement). It is the intention of the parties to this Agreement that the sole remaining obligations of the parties shall be those which are set forth in this Agreement with respect to the sale and disposition of the assets of Wilson, Sweldon, and Lakeside.

As such, Paragraph Two operates as a release. Whether it operates as a "general release" or a release of the Wilson Defendants only is the primary dispute between the parties.

In addition, the Settlement Agreement provides that the release contained in Paragraph Two shall not operate to bar an action against the Wilson Defendants if it is found within six years that the Wilson Defendants misrepresented their financial condition or the composition of the control group to Central States. Specifically, Paragraph One provides that

> [i]f the representations and warranties set forth in this Paragraph [regarding the composition of the control group] are false in any material respect ..., [Central States] shall not be barred by the provisions of Paragraph [Two] from commencing an action against Wilson, Sweldon, and Lakeside.

In addition, Paragraph Five provides that

> Wilson, Sweldon, and/or Lakeside have provided [Central States] with certain financial statements, tax returns, and appraisals which, to the best of their knowledge and taking into account the Withdrawal Liability Claim, do not misrepresent the aggregate financial condition of such companies in any material respect as of the date(s) thereof. This Agreement does not preclude any claims against Wilson, Sweldon, or Lakeside ... if it is determined that the provisions of the preceding sentence are false in any material respect.

### C.

Central States filed the present suit against the Wilson Defendants, the Melody Defendants, the George Partnership, Michael George, and Sharkey George on July 25, 1994. It later filed a First Amended Complaint. The Plaintiffs allege that the various Defendants are jointly and severally liable for the withdrawal liability assessed by Central States. After addressing several pretrial motions, a bench trial in this matter was held. This Memorandum, Opinion, and Order presents the opinion of the Court following the trial.

### II.

The present lawsuit arises under ERISA, 29 U.S.C. §§ 1001 *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381–1461. The MPPAA was enacted because ERISA "did not adequately protect pension plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdrew from, multiemployer plans." *Flying Tiger Line v. Teamsters Pension Trust Fund,* 830 F.2d 1241, 1243 (3d Cir.1987) (quoting *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 722, 104 S.Ct. 2709, 2714,

81 L.Ed.2d 601 (1984)). As the Supreme Court explained in *R.A. Gray:*

> A key problem of ongoing multiemployer plans ... is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.

467 U.S. at 722 n. 2, 104 S.Ct. at 2714 n. 2 "The threat of significant employer withdrawals also jeopardized the solvency of the Pension Benefit Guaranty Corporation ['PBGC'], which was created to provide benefits to plan participants in the unfortunate event that a pension plan was terminated without sufficient assets to cover guaranteed benefits." *Mason & Dixon Tank Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund,* 852 F.2d 156, 158 (6th Cir.1988) (quoting *R.A. Gray,* 467 U.S. at 721, 104 S.Ct. at 2713–14).

■ The MPPAA addressed this problem by assessing withdrawing employers with withdrawal liability, defined in the statute as the employer's adjusted "allocable amount of unfunded vested benefits." 29 U.S.C. § 1381(b)(1). Its purpose is "to fix liability upon those who were responsible for continued funding at the time of withdrawal." *Central States, Southeast and Southwest Areas Pension Fund v. Skyland Leasing Co.,* 691 F.Supp. 6, 12 (W.D.Mich.1987).

■ The MPPAA definition of "employer," found at § 1301(b)(1), is key to the present case. Section 1301(b)(1) provides in relevant part as follows:

> For purposes of this subchapter under regulations prescribed by the [Pension Benefit Guaranty] Corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer.

This "common control provision" thus mandates that all members of a group subject to "common control" are to be treated as a single employer and that all members of such a "common control group" are responsible for any employer liability. *Central States, Southeast and Southwest Areas Pension Fund v. Rogers,* 843 F.Supp. 1135, 1141 (E.D.Mich.1992); *Skyland Leasing Co.,* 691 F.Supp. at 11. The primary purpose of this provision is "to ensure that employers will not circumvent their ERISA and MPPAA obligations by operating through separate entities." *Rogers,* 843 F.Supp. at 1141 (quoting *Mason & Dixon,* 852 F.2d at 159).

■ The procedures established for the assessment and collection of withdrawal liability have largely been followed in this case. The MPPAA requires a Plan's trustees to determine initially whether a withdrawal has occurred. 29 U.S.C. §§ 1382(1), 1399(b)(1)(A)(i). When the trustees conclude that a withdrawal has taken place, they must then notify the employer of the amount of the liability and demand payment in accordance with an amortization schedule. 29 U.S.C. §§ 1382(2)–(3), 1399(b)(1)(B). The law is clear that notice to one member of a common control group is notice to all members of the group. *Rogers,* 843 F.Supp. at 1143.

■ After receiving the requisite notice, the employer may within 90 days ask the trustees of the applicable pension fund to conduct a reasonable review of the computed liability. 29 U.S.C. § 1399(b)(2)(A)(i). If a dispute remains, either party may initiate arbitration proceedings. 29 U.S.C. § 1401(a)(1). If the statutorily-defined time to arbitrate expires without arbitration, the liability of the employer becomes fixed and is due and owing from whomever may be found to be within the common control group with the withdrawing entity. *Rogers,* 843 F.Supp. at 1143.

Finally, upon completion of the arbitration proceedings in favor of one of the parties, the MPPAA permits any party to the arbitration to bring an action to enforce, vacate, or

modify the arbitrator's award in the appropriate federal district court. 29 U.S.C. § 1401(b)(2). If, on the other hand, the time for arbitration expires, the pension fund may also bring an action to enforce the withdrawal liability, which is fixed and not subject to challenge.

## III.

To decide this case in its entirety, the Court must resolve the issues listed in the Joint Final Pretrial Order. Those issues, as summarized by the Court, are as follows:

(1) Whether the Settlement Agreement executed by the Wilson Defendants and Central States releases "all the world" and therefore bars this action?

(2) Whether the $31,878.40 paid by the Wilson Defendants to Central States upon their liquidation under the terms of the Settlement Agreement constituted an accord and satisfaction of the entire alleged withdrawal liability?

(3) Whether the Wilson Defendants, or any one of them, misrepresented the control group composition to Central States in negotiating and executing the Settlement Agreement?

(4) Whether the Wilson Defendants, or any one of them, misrepresented the financial condition of Wilson, Sweldon, or Lakeside in negotiating and executing the Settlement Agreement?

(5) Whether the Wilson Defendants, or any one of them, fraudulently induced Central States to enter into the Settlement Agreement by means of the alleged misrepresentations?

(6) Whether the present action is barred under the doctrine of laches?

(7) Whether Central States' calculation of damages is accurate and in compliance with federal law?

The issues outlined above are those that the Court must decide in order to determine whether the Plaintiffs have prevailed on the remaining Counts in the Complaint. Those Counts are as follows:

*Count One:* Withdrawal liability claim against the Melody Defendants, the George & George partnership, Michael George, and Sharkey George. This claim is dependent upon a finding that the release in the Settlement Agreement does not release these parties.

*Count Two:* Withdrawal liability claim against the Wilson Defendants. This claim is dependent upon a finding that the release in the Settlement Agreement may be voided as against the Wilson Defendants due to material misrepresentations regarding the composition of the control group and/or the financial condition of the Wilson Defendants.

*Count Four:* Fraudulent Inducement claim against the Wilson Defendants.

In deciding the issues at hand, the Court has not entertained or given consideration to arguments directed at issues resolved during the pretrial proceedings in this case. Most significantly, this Court has already determined:

(1) that the release in the Settlement Agreement is ambiguous on its face and that the Court must therefore look to objective evidence of the intent of the parties to that Agreement to determine the scope of the release;

(2) that all the Defendants were members of a common control group at one time prior to August 1984;

(3) that the Melody Defendants received constructive notice of the assessment of withdrawal liability which was directed to Wilson and "equally to all members of any controlled group of trades or businesses ... of which [Wilson] is a member;" and

(4) that regardless of whether the Melody Defendants did in fact sever themselves from the Wilson Defendants prior to August 1984, the Defendants waived the severance defense by failing to arbitrate it prior to the expiration of the statutorily-defined time for arbitration.

As a final matter, although the parties have briefly argued about the operation of the statute of limitations in this case, that issue was not placed before this Court in the Joint Final Pretrial Order. F.R.Civ.P. 16(e) provides that the pretrial order "shall control the subsequent course of the action unless modified by a subsequent Order." Similarly, Local Rule 16.2(a) of this district provides that the Joint Final Pretrial Order, "when signed and filed in the Clerk's Office, becomes an Order of the Court, superseding the pleadings and governing the course of trial unless modified by further Order."

The Joint Final Pretrial Order in this case, filed December 10, 1996, does not preserve a statute of limitations issue for trial. The statute of limitations is not included among either the Issues of Fact or the issues of Law in that Order. Furthermore, both the Plaintiffs' Claims and the Defendants' Claims state that the statute of limitations arguments have been resolved prior to trial. As such, to the extent that issues relating to the statute of limitations remained open to further argument, they were closed by the Joint Final Pretrial Order signed by the parties to this action. The Court will find no statute of limitations bar to the present case.

### A.

The most significant of the issues to be decided in this case, and the one given the greatest emphasis by the parties, is whether the Settlement Agreement executed by the Wilson Defendants and Central States releases "all the world" and therefore bars this action or, alternatively, whether it releases the Wilson Defendants only. The Court must consider this question because the Defendants have raised the affirmative defense that the Settlement Agreement releases "all the world" and therefore bars the present action against the Melody Defendants. As such, the Defendants bear the burden of proof on this issue.

This Court has already ruled that the Settlement Agreement is ambiguous on this issue. In other words, it ruled that the Settlement Agreement, and particularly Paragraph Two of the Settlement Agreement, may reasonably be read to release only the Wilson Defendants but that it may also reasonably be read to release "all the world." As such, it held that it would be necessary here, as in all contract cases, to consider extrinsic evidence of the intent of the signatories to the Settlement Agreement to determine the proper interpretation of that Agreement. As the Sixth Circuit has held, "[i]f the scope of a release agreement is ambiguous, 'the question thus becomes one of determining the intention of the parties to the release.'" *Taggart v. United States*, 880 F.2d 867, 870 (6th Cir.1989) (quoting *Stitt v. Mahaney*, 403 Mich. 711, 272 N.W.2d 526, 527 (1978)) *See also Schachner v. Blue Cross*, 77 F.3d 889, 893 (6th Cir.1996). The parties have now put their evidence into the record and presented their arguments as to how that evidence supports their competing Interpretations.

In considering the proper decision, the Court has kept closely in mind several basic tenets of contract interpretation. Specifically, in ruling on the intent of the parties, the Court would err to consider the subjective intent of the parties or their representatives. Judge Feikens stressed this point in *Sprague v. General Motors Corp.*, 843 F.Supp. 266, 306 (E.D.Mich.1994):

[S]ubjective intent is *not* the proper test in a contract case. Contractual intent is concerned with objective manifestations of intent, not with the subjective, hypothetical, unexpressed, or nonexistent intentions of the parties. "The relevant intention of a party is that manifested by him rather than any different undisclosed intention. In cases of misunderstanding, there may be a contract in accordance with the meaning of one party if the other knows or has reason to know of the misunderstanding and the first party does not."

(quoting Restatement (Second) of Contracts § 212, comment (a)).

After considering the evidence presented by the parties in this case, this Court is struck by the total absence of objective evidence on this issue. Looking at the Defendants' evidence, the Court recalls that the Defendants put on the testimony of William Edmunds, an attorney for the Wilson Defendants. Edmunds testified that it was his intent that the release would release "all the

world." He also explained that he desired a general release in order to protect his clients from having to defend against potential third-party claims in the future. However, he also testified that he never expressed this intent to Central States. The case law makes very clear that such evidence of subjective intent may not be considered.

The Plaintiffs, on the other hand, rely primarily on the testimony of Terence Craig about the routine practice of Central States that is intended to ensure that the Fund fulfills its fiduciary duties. While this Court ruled as a general matter that such testimony is admissible, now that that evidence has been received, the Court finds that it has proved to be unhelpful. First, evidence of Central States' policy must be viewed as largely analogous to Mr. Edmunds' subjective intent in the absence of evidence that that policy was expressed to the Wilson Defendants in the course of executing the Settlement Agreement. No such evidence was provided. Furthermore, such information is not of the type that the Wilson Defendants "should have known," despite the fact that a Settlement Agreement that did contain a general release might constitute a breach of fiduciary duty. Central States is not entitled to a presumption that it fulfilled its fiduciary duty; indeed, that is largely the question at hand.

■ Furthermore, the Court is cognizant that in order to be probative, evidence of a routine or habit must be shown "with a degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather conduct that is 'semi-automatic' in nature." *Simplex, Inc. v. Diversified Energy Systems, Inc.*, 847 F.2d 1290, 1293 (7th Cir. 1988). In addition, the party offering such evidence must "show a sufficient number of specific instances of such conduct to support th[e] inference" permitted under Rule 406. *Mobil Exploration and Producing, U.S., Inc. v. Cajun Construction Services, Inc.*, 45 F.3d 96, 99 (5th Cir.1995). In this case, although Mr. Craig testified that he supervised hundreds of cases to ensure that the relevant policies were followed, the Plaintiffs put on no other specific instances where such poli-

cies were expressed in the arbitration or settlement process. Furthermore, Mr. Craig testified that Central States allows general releases in some cases; however, he was unable to articulate a policy as to when such exceptions are appropriate. Finally, it was shown that the language in the Settlement Agreement was largely taken from a draft prepared by the Wilson Defendants. Given all of this, and especially given the fact that Central States presented no evidence that it expressed its policy to the Wilson Defendants, the Court cannot find that the testimony of Mr. Craig was helpful to the determination of the intent of the parties to the Settlement Agreement.

As such, the Court is left with little more than the arguments of the parties as to what the Settlement "obviously" provides on its face. These arguments must also fail, especially when taken alone, as this Court has already ruled that the Settlement Agreement is ambiguous on its face. Thus, to have the outcome of this matter turn on such arguments would be inconsistent with this Court's prior ruling.

Finally, the Court does not find that it can accept Central States' argument that the ambiguity must be construed against the Defendants. Such an approach is applicable to adhesion, take-it-or-leave-it contracts. While it is true that the parties ultimately chose a great deal of the draft presented by Mr. Edmunds, the Court finds that the Settlement Agreement was nevertheless the result of extended negotiations.

As such, the Court must find, based on the evidence presented, that the parties never negotiated or otherwise expressed an intent as to whether Paragraph Two of the Settlement Agreement would release parties other than the Wilson Defendants. In other words, there was no meeting of the minds between the parties on this issue. As such, the Court must find that there was at best a mutual misunderstanding as to the scope and effect of that release.

■ However, as the Plaintiffs have correctly pointed out, the Defendants have the burden of proof on this question, as release is an affirmative defense. The Sixth Circuit

has held that, with regard to a contract that is otherwise fully performed, "where there is a mutual misunderstanding as to the contract term, . . . the court will rule against the party bearing the burden of proof." *United Steelworkers v. North Bend Terminal Co.,* 752 F.2d 256, 261 (6th Cir.1985). *See also Romero v. King,* 368 Mich. 45, 55, 117 N.W.2d 119 (1962). As the Court finds that the contract in this case was fully performed, and as it has found a mutual misunderstanding as to the scope and effect of the release, it must now find that Defendants have not met their burden on this issue and the affirmative defense of release must fail.

**B.**

■ The second issue the Court must decide is whether the $31,878.40 paid by the Wilson Defendants to Central States upon the liquidation of the Wilson Defendants under the terms of the Settlement Agreement constituted an accord and satisfaction of the entire original alleged withdrawal liability assessment of over $1.3 million. Given the finding on the first issue, the Court must similarly find that the Defendants have not met their burden of showing that the payment made to Central States by the Wilson Defendants in performance of the Settlement Agreement constituted an accord and satisfaction of the entire alleged withdrawal liability of over $1.3 million.

First, the Court notes that the Defendants offer very little argument on this issue. In fact, they offer no case authority of any kind. More importantly, what argument Defendant does make rests upon the same language in Paragraph Two in the Settlement Agreement that was considered by the Court in ruling on the release issue. The Court has already ruled that the language in Paragraph Two is ambiguous as to whether it constitutes a general release. It now rules, to the extent that such a ruling is not already inherent in that prior ruling, that that same language is no less ambiguous as to whether it amounts to an accord and satisfaction. Finally, there was no objective evidence put before this Court that could support a finding that the parties mutually intended the payment made by the Wilson Defendants to constitute an accord and satisfaction of the entire original withdrawal liability assessment.

**C.**

At Count Two of the Amended Complaint, Central States brings a withdrawal liability claim against the Wilson Defendants.[2] In order to proceed with this withdrawal liability claim, Central States must show that the Wilson Defendants misrepresented the composition of the control group alternatively, that they misrepresented their financial condition when negotiating and executing the Settlement Agreement. Without such a showing, the claim against the Wilson Defendants would be barred by the release contained in the Settlement Agreement. The Settlement Agreement provides that if the representations made by the Wilson Defendants regarding the composition of the control group or regarding the financial condition of those Defendants "are false in any material respect," Central States shall not be barred by the release from commencing an action against the Wilson Defendants. As such, Count Two, for withdrawal liability from the Wilson Defendants, is dependent upon a preliminary finding of a misrepresentation.

This Court has already found that the Melody Defendants and the Wilson Defendants were at one time prior to 1984 members of a common control group. The parties merely disagree as to whether the control group relationship had been severed prior to August 1984. The Defendants argue vigorously at this junction, as they have throughout this case, that the Melody Defendants had severed from the Wilson Defendants prior to August 1984 and therefore were not part of a common control group at that time. Thus, they argue that the Wilson Defendants did not

---

2. *As a note of clarification, although the parties have sometimes referred to Count Two as a misrepresentation claim, the Court finds that Count Two is a withdrawal liability claim. This point is significant in that it disposes of any need to* address the argument that Count Two is preempted by ERISA. Rather, as understood by the Court, Count Two arises directly under the withdrawal liability provisions of ERISA.

misrepresent in the Settlement Agreement the composition of the control group but in fact made a truthful disclosure.

Although this Court and others have acknowledged that the law in this area can lead to harsh consequences, *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.* 788 F.2d 118, 129 (3d Cir.1986); *Rogers,* 843 F.Supp. at 1147; *Skyland Leasing,* 691 F.Supp. at 13–14, that law must be followed all the same. Given the fact that the Wilson Defendants and the Melody Defendants were at one time members of a common control group, this Court must find that—just as the Melody Defendants are barred from raising the defense of severance—the Wilson Defendants are similarly barred. That is, Central States has shown that the Wilson Defendants and the Melody Defendants were in a common control group prior to 1984, and the Wilson Defendants are barred from arguing that a severance occurred thereafter. As such, the Court must find, in accordance with its finding that the Defendants were in a common control group, that the control group information provided by the Wilson Defendants was false. As stated by the court in *Rogers,* a case relied on extensively by this Court throughout this litigation, "where the time to seek arbitration has expired, the 'employer' cannot raise any defenses that would otherwise have been subject to arbitration." 843 F.Supp. at 1144 (E.D.Mich. 1992).

█ The question as to the membership of the control group is an issue for arbitration. *Flying Tiger,* 830 F.2d at 1243; *Rogers,* 843 F.Supp. at 1146; *Skyland Leasing,* 691 F.Supp. at 14. Although the Wilson Defendants stepped forward to arbitrate and eventually settle the withdrawal liability, they did not raise the issue of the prior severance of the Melody Defendants during the settlement negotiations or at any time before the time to arbitrate expired. Consequently, they—as part of the group of entities comprising the "employer" in this case— are now barred from raising this argument to defend against Count Two. As such, the Court finds that the release in the Settlement Agreement cannot bar Central States'

withdrawal liability action against the Wilson Defendants.

Given this finding, the question as to whether the Wilson Defendants misrepresented their financial condition becomes moot. Central States raises this argument in order to void the release as against the Wilson Defendants. As the Court has ruled that the release is void, there is no need to reach this second, duplicative question.

### D.

█ The next issue that the Court must address is whether the Wilson Defendants, or any one of them, fraudulently induced Central States to enter into the Settlement Agreement by means of the alleged misrepresentations. The Defendants have raised two challenges to this claim, Count Four of the Amended Complaint. First, they argue that this is a common law claim which must be dismissed due to ERISA preemption. Second, they argue that the evidence cannot support a finding of fraud. The Court agrees with the Defendants' first argument. It finds that Central States' fraudulent inducement claim is preempted by ERISA and therefore must therefore be dismissed.

█ It is beyond argument that any state law claim brought for the purpose of collecting withdrawal liability is preempted by ERISA. "[T]he enforcement scheme ERISA provides for withdrawal liability is an exclusive remedy.... Thus, claims relating to withdrawal liability are limited to the specific remedies ERISA provides and cannot be satisfied by invoking state law remedies." *Central States, Southeast and Southwest Areas Pension Fund v. Marquette Bank,* 836 F.Supp. 673, 676–77 (D.Minn.1993). Furthermore, the Sixth Circuit has clearly articulated that it has "not yet formally embraced an ERISA cause of action under federal common law." *Tassinare v. American Nat'l Insurance,* 32 F.3d 220, 225 (6th Cir.1994). As such, federal common law "can neither provide an independent source of rights with regard to employee benefit plans nor substitute for remedies authorized by the ERISA statute." *Central States, Southeast and Southwest Areas Pension Fund v. Mahoning Nat'l Bank,* 112 F.3d 252, 257 (6th Cir.1997).

Rather, Central States may "avail [itself] only of those remedies authorized by statute." *Tassinare,* 32 F.3d at 225.

Thus, Central States may proceed with this claim only if the withdrawal liability provisions of ERISA specifically provide for such a claim. Central States has presented nothing to this Court to show that it does. Indeed, the Court finds that the suit that ERISA permits Central States to pursue against the Wilson Defendants is the general withdrawal liability claim that it has brought under Count Two. Count Four, styled as a fraudulent inducement claim, arises out of the common law of fraud rather than ERISA itself. The Court would err in allowing this claim to proceed, as it affords Central States merely a substitute for the remedies authorized by the statute. This Court finds that Count Four is preempted by ERISA and must be dismissed.

Given the finding of ERISA preemption, there is no need to reach the secondary question of whether the evidence in this case can support a finding of fraud.

### E.

 The next issue the Court must address is whether the present case is barred under the doctrine of laches. "Laches consists of two elements: (1) inexcusable delay in instituting a suit; and (2) resulting prejudice to the Defendants." *In re Centric Corp.,* 901 F.2d 1514, 1519 (10th Cir.1990). Laches is an affirmative defense; thus, the Defendants bear the burden of proof on this issue.

 The Court finds no support for a finding that the doctrine of laches bars this case. More specifically, it finds no excusable delay on the part of Central States in instituting this suit. In order to prove inexcusable delay on the part of Central States, the Defendants must show a lack of diligence on the part of Central States. *Central States, Southeast and Southwest Areas Pension Fund v. Lloyd L. Sztanyo Trust,* 693 F.Supp. 531, 541 (E.D.Mich.1988) (Suhrheinrich, J.). The evidence before the Court cannot support such a finding.

Wilson ceased operations in August 1984. Central States sent Wilson a Statement of Business Affairs two months later, in October 1984, seeking information about the composition of the control group. Central States then sent a second Statement of Business Affairs to Wilson in April 1985. The notice of withdrawal liability was then sent to Wilson just one month later, in May 1985. The Settlement Agreement was then worked out between Central States and the Wilson Defendants over the course of the next three years. After executing that Agreement, Central States then sent the case to outside counsel for investigation of possible further control group members.

The Court cannot find a lack of diligence in this set of facts. To find otherwise would be to fly in the face of the many cases which stress that the responsibility to come forward with information relating to control group membership falls on the members, both past and present, not on the pension fund. For example, the court in *Rogers* stressed that "in general, plan sponsors have no way of knowing all the other possible entities commonly owned by a participating corporation. In contrast, stockholders and officers of corporations certainly are aware of their holdings." 843 F.Supp. at 1141. Thus, given that Central States sent two Statements of Business Affairs to Wilson, the Court cannot find that it failed to make the necessary investigation.

This finding is not inconsistent with *Central States, Southeast and Southwest Areas Pension Fund v. Mississippi Warehouse Corp.,* 853 F.Supp. 1053 (N.D.Ill.1994), a case relied on by the Defendants. In *Mississippi Warehouse,* Dean Truck, a control group member, listed Mississippi Warehouse as a past control group member in documents filed in a suit that it joined against the PBGC and Central States. The Court found that Central States was barred by the "after knowledge" provision of the MPPAA in bringing suit against Mississippi Warehouse because it failed for several years to follow up on that direct information about Mississippi Warehouse's identity as a potential control group member which was provided by other control group members. 853 F.Supp.

at 1060–61. Here, by contrast, Central States actively sought such information from other alleged control group members and no such information was provided.

In this case, the Defendants have attempted to show that Central States turned a blind eye to investigatory leads that would have lead to information about the relationship between the various Defendants. They argue that Central States "sat back" rather than promptly following those leads and waited until the severance defense would be unavailable to past control group members. The Court is not persuaded by the Defendants' arguments.

For example, the Defendants point to the 1986 settlement meeting in Chicago. At that meeting, Central States representatives were handed a business card by Michael George who owned a half interest in Wilson. The business card displayed Michael George's affiliation with the Melody Defendants, and the meeting participants apparently discussed the possibility of bringing the Melody Defendants into the control group with the Wilson Defendants. This in no way shows that Central States should have learned from that encounter that Melody had been in a common control group with the Wilson Defendants in the past. If anything, it shows that the Melody Defendants were on notice of the withdrawal liability proceedings. In addition, the Defendants made repeated reference to Colonel Meyers ("Meyers") of the Teamsters and presented evidence of his relationship to the various Defendants and to Central States. Regardless of whether the Defendants could show that Meyers was aware of the precise nature of relationship between the various Defendants, there is nevertheless no basis upon which to attribute that knowledge to Central States or to dismiss this case because Central States failed to seek out information from that particular source. Central States went to the control group members themselves. That was adequate. Thus, under the law as it stands, it is the Defendants who must be seen to have "sat back."

As a final matter, because the Court finds no inexcusable delay on the part of Central States, it need not reach the secondary issue of prejudice. This suit is not barred under the doctrine of laches.

## F.

The final issue this Court must decide is whether Central States' calculation of damages is accurate and in compliance with federal law. The Defendants have offered no evidence to suggest that the calculation of damages in this case was in error or was contrary to law. The Court would have been compelled to disallow such evidence in any case and to find that such a defense, like the waiver defense, is barred. *Rogers*, 843 F.Supp. at 1143; *Skyland Leasing*, 691 F.Supp. at 14–15. Thus, the calculation of damages presented by Central States, for $1,379,912.71 plus the additional relief provided for under ERISA, must be permitted to stand.

## IV.

In sum, this Court directs judgment in favor of the Plaintiffs on Counts One and Two and dismisses Count Four as preempted under ERISA.

**IT IS SO ORDERED.**